United States District Court
District of Maine

Daniel J. Chartier,

    Plaintiff,

v.

Louis DeJoy, Postmaster General,
United States Postal Service,

    Defendant.

Civil No.:

Complaint and Demand for Jury Trial
and Injunctive Relief Sought

Plaintiff Daniel J. Chartier brings this civil rights action against Defendant Louis DeJoy, Postmaster General of the United States Postal Service ("Postal Service" or "Agency"), and complains as follows:

Summary of the Action

1. Mr. Chartier provided excellent delivery and cleaning services for the Postal Service for sixteen years, working primarily out of the Post Office in Rumford, Maine. The long-time Rumford Postmaster, Carol A. Guimont,

testified under oath that Mr. Chartier was "a dedicated employee," "reliable," and a "hard working individual."

2. But in 2016 Mr. Chartier's highly successful career with the USPS suddenly went downhill after he successfully filed an internal discrimination complaint about an unfair discipline imposed in March 2016 by Jack Kaubris. Kaubris was the Postmaster of a nearby Post Office where Mr. Chartier worked occasionally.

3. Mr. Chartier's EEO complaint was quickly recognized by the Postal Service as meritorious. It agreed to the complete removal of the challenged discipline as part of a favorable EEO settlement on July 12, 2016.

4. The day after the favorable EEO settlement, on July 13, 2016, Postmaster Kaubris sent a long, angry email to two supervisors confessing that he planned to retaliate against Mr. Chartier because of his successful EEO complaint against Kaubris. Postmaster Guimont testified that Postmaster Kaubris was angry about the favorable resolution of Mr. Chartier's EEO complaint and that she interpreted Kaubris's July 13 email as stating the intent to take a future adverse action against Mr. Chartier because of his EEO complaint against Kaubris.

5. Postmaster Kaubris promptly made good on his threat to retaliate against Mr. Chartier, including by papering his file with implausible and incoherent "Form 5500" disciplines.

6. For example, Postmaster Kaubris escalated his campaign of retaliation against Mr. Chartier by disciplining him based on the false allegation that Mr. Chartier blew up and threatened a coworker during a conversation on November 1, 2016.

7. That coworker testified under oath that she never filed any complaint against Mr. Chartier about his conduct on November 1, and was surprised that Postmaster Kaubris had done so. In her words under oath: "there was nothing to discipline. Nothing had occurred [on November 1]. He didn't threaten me, he didn't say anything of offense. I have no idea why it was escalated."

8. Both Postmaster Guimont and the coworker have testified under oath that Postmaster Kaubris then caused a November 7, 2016 incident that was used as the grounds to ban Mr. Chartier from postal premises.

9. Postmaster Kaubris's retaliatory campaign exacerbated Mr. Chartier's underlying serious health conditions and caused him to have multiple medical emergencies in the workplace. The Postal Service compounded these injuries by repeatedly disciplining Mr. Chartier for taking emergency medical leave, including issuing him discipline for leaving work to go to the emergency room for legitimate medical emergencies.

10. Postmaster Guimont testified that she knew Mr. Chartier had a serious medical episode on November 7, 2016 and that she was concerned he might die. She has also testified that Mr. Chartier's spouse gave her "prompt notice" of his medical emergency almost as soon as it happened.

11. And in its written explanation for its decision to bar Mr. Chartier from all its Postal premises, the Postal Service unlawfully and explicitly relied on his protected serious health conditions.

12. The Postal Service also relied on false allegations against Mr. Chartier's about his conduct with the coworker on November 7, 2016. That coworker testified that a key fact relied upon by the Postal Service never happened and that the coworker did <u>not</u> want to escalate, or otherwise report up, that interaction with Mr. Chartier.

13. The Postal Service relied on stereotypes about Mr. Chartier's serious health conditions and other false and pretextual reasons to erroneously conclude that Mr. Chartier posed a "threat" in the workplace. It made this life-changing and highly defamatory determination without even talking to Mr. Chartier.

14. The Postal Service banned Mr. Chartier from having any access to the mail and postal premises, effectively ending his career with the Agency, without conducting any serious investigation.

15. Mr. Chartier now brings this action to vindicate his right to be free from intentional discrimination and retaliation in the workplace.

## The Parties

16. Plaintiff, Mr. Daniel J. Chartier, is a citizen of the United States and is a resident of Rumford, Oxford County, Maine.

17. Defendant, Louis DeJoy, is the Postmaster General of the United States Postal Service.

## Jury Trial Demand

18. Under Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands trial by jury on all issues triable to a jury.

## Jurisdiction and Venue

19. This action arises under Sections 501 and 504 of the Rehabilitation Act, 29 U.S.C. §§ 791, 794; the Family and Medical Leave Act, 29 U.S.C. §§ 2601-2654; and Section 704 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). This Court has proper subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. §§ 1331, 1343.

20. Venue is proper in the District of Maine under 28 U.S.C. § 1391(e)(1) because Defendant is an officer of a United States agency, a substantial part of the events giving rise to these claims occurred in Maine,

and Plaintiff resides in Maine. Under Rule 3(b) of the Rules of this Court, this action is properly filed in Portland because a substantial part of the events giving rise to the claims occurred in Oxford County.

## Factual Allegations

21. Mr. Chartier worked for the Postal Service for nineteen years.

22. He began working for the Agency in 1997 through a cleaning contract.

23. In 2000, the Agency awarded Mr. Chartier a highway contract delivering the mail.

24. Mr. Chartier did not have any special skills in mail delivery when the Postal Service hired him.

25. The Postal Service trained Mr. Chartier for his position and continued to provide ongoing training over the years alongside Postal Service employees.

26. In his highway contractor role, Mr. Chartier performed the core Postal Service function of delivering the mail.

27. The Postal Service provided Mr. Chartier with the tools he needed to perform his job, such as scanners, hampers, mail grabbers, straps, mail trays, bands, marker cards, and sorting cases.

28. The Postal Service exercised a high degree of control over Mr. Chartier's day-to-day work, including tracking his movement with a GPS device and requiring that he submit exact, minute-by-minute timesheets for his hours worked.

29. The Postal Service required that Mr. Chartier perform certain tasks on-site at the Rumford Post Office, including the sorting and casing of mail.

30. Mr. Chartier performed these on-site tasks side-by-side with workers the Postal Service classified as employees in a row of identical work stations, called "cases."

31. The Postal Service required that Mr. Chartier conform to Postal Service delivery standards and issued "irregularity reports" to Mr. Chartier for any deviations from its standards in his job performance.

32. The Postal Service had the right to unilaterally change Mr. Chartier's schedule because of mail volume or route changes.

33. The Postal Service instructed Mr. Chartier not to deliver mail on days when it deemed weather or road conditions too poor.

34. The Postal Service required Mr. Chartier to perform additional tasks beyond his contract terms.

35. For example, when the operational hours changed at the East Andover Post Office, Mr. Chartier was required by the Postal Service to break

down mail for the facility and to scan all packages as "arrived at unit." These were tasks typically performed by Postal Service clerks and were outside the scope of Mr. Chartier's contractual duties.

36. The Postal Service set Mr. Chartier's work schedule.

37. The Postal Service required that Mr. Chartier make deliveries at the Rumford, Andover, and East Andover Post Office locations within specific time frames each day.

38. For example, the Postal Service required that Mr. Chartier perform dock sorting and loading at the Rumford Post Office between 6:45 - 7:00 a.m., and at the Andover Post Office between 7:25-7:30 a.m., 11:40-11:50 a.m., and 3:45-4:00 p.m.

39. The Postal Service paid Mr. Chartier on a monthly, salary-like basis, rather than by project or task.

40. Mr. Chartier performed delivery services exclusively for the Postal Service; he did not have any other clients.

41. Mr. Chartier has been diagnosed with serious and long-term forms of anxiety disorder, depression, and post-traumatic stress disorder (PTSD).

42. He has undergone extensive psychological and psychiatric treatment related to his mental health conditions.

43. Mr. Chartier's mental health conditions have substantially limited his ability to engage in major life activities, including thinking, sleeping, breathing, working, and concentrating.

44. In 2013, then-Rumford Post Office Officer-in-Charge Gretchen Anderson held a meeting for all staff about sexual harassment.

45. During this training, Ms. Anderson falsely claimed in front of the entire group that Mr. Chartier had filed a complaint about two employees hugging each other, and that this (completely made-up) complaint was inappropriate.

46. Mr. Chartier complained to Ms. Anderson about her false and defamatory statements about him and pressed her to correct them. She reluctantly did so, but held a grudge against Mr. Chartier for speaking up about her use of sex-based stereotypes to falsely pigeon-hole him as guilty of boorish behavior.

47. In January 2014, in retaliation for his complaint against her in 2013, Ms. Anderson filed a false report against Mr. Chartier and claimed that he had physically assaulted her by grabbing her arm and throwing her against a concrete wall. Mr. Chartier had done no such thing.

48. That same day, two postal inspectors came to Mr. Chartier's house to question him about Ms. Anderson's complaint. Just two hours later,

Mr. Chartier received a call saying he was cleared of any wrongdoing and could go back to work.

49. A manager in Connecticut also called Mr. Chartier and delivered the same message, that he had been completely exonerated. Ms. Anderson was removed from the Rumford Post Office.

50. However, Mexico Postmaster Jack Kaubris magnified Ms. Anderson's sex-based stereotyping by repeating her false and discriminatory allegations against Mr. Chartier. For example, Mr. Kaubris wrote in an October 8, 2014 email that he "believe[d] [Mr. Chartier] made physical contact with an OIC during an altercation."

51. Mr. Kaubris treated Mr. Chartier worse than female Postal Service employees, including by siding with female clerks in any work-related issues involving Mr. Chartier without first trying to find out the facts. For example, Mr. Kaubris instructed female clerk Lee Sherry to document incidents with Mr. Chartier, but did not similarly instruct Mr. Chartier to do the same.

52. Mr. Chartier reported this sex-based difference in treatment to the Postal Service in March 2016.

53. That same month, Mr. Kaubris mocked Mr. Chartier's anxiety disorder by telling Mr. Chartier's sister and Postal Service employee Lisa Walsh : "It wasn't a panic attack, it was a Dan attack" or words to that effect.

54. Also in March 2016, Mr. Chartier received a "Form 5500" disciplinary notice for putting an empty tub in the same place he had put it for years.

55. This was the first "Form 5500" Mr. Chartier had ever received.

56. On July 12, 2016, Mr. Chartier participated in an Equal Employment Opportunity (EEO) mediation with Rumford Postmaster Carol Guimont, Mr. Kaubris, and others to address Mr. Chartier's complaints of sex-based discrimination.

57. Mr. Kaubris was extremely angry about the favorable outcome Mr. Chartier achieved at the EEO mediation. In a July 13, 2016 email, Mr. Kaubris wrote that he was considering legal action based on the Postal Service's agreement to settle Mr. Chartier's EEO complaint, which included the removal of the Form 5500 discipline Mr. Kaubris had imposed on Mr. Chartier.

58. Mr. Kaubris also wrote that Mr. Chartier was "paranoid" and that his "nervous breakdown/panic attack" was "a result of his actions and no one elses [sic]."

59. In October 2016, Mr. Chartier received a Form 5500 discipline for failing to provide notice of an absence from work. Mr. Chartier had a medical emergency related to his mental health diagnoses that required a visit to the hospital emergency room.

11

60. Due to the medical emergency, Mr. Chartier was unable to personally provide notice of his absence. However, his wife, Postal Service employee Pam Chartier, provided contemporaneous notice on his behalf.

61. The Postal Service disregarded this contemporaneous notice from Pam Chartier and disciplined Mr. Chartier for the disability-related absence.

62. In early November 2016, Mr. Chartier received another Form 5500 discipline from Mr. Kaubris, this time for having a personal and not work-related conversation with Postal Service employee Lisa Donahue.

63. Mr. Chartier did have a conversation with Ms. Donahue that day, but it was work-related, not personal.

64. Postal Service workers routinely had short, personal conversations with each other every day, without any discipline imposed by management.

65. Mr. Kaubris falsely reported in the November 1, 2016 Form 5500 that Mr. Chartier had blown up at Ms. Donahue.

66. Ms. Donahue had not filed any complaint about Mr. Chartier and did not think there was anything threatening or offensive about his conduct towards her during their conversation. She did not report to Mr. Kaubris that Mr. Chartier had blown up at her.

67. Mr. Chartier next saw Ms. Donahue at work on November 7, 2016.

68. Soon after he arrived at work, Ms. Donahue called out to Mr. Chartier from her work-station to apologize for giving Mr. Chartier's employee Brandon Burgess the wrong mail the prior Saturday. Mr. Chartier said something like "everyone makes mistakes."

69. Mr. Chartier then said he could not talk to her further, because he had been written up for talking to her less than a week before. He did not get closer to Ms. Donahue than about eight to 10 feet away and made no threatening gestures. There was a large metal desk between them during the entire interaction.

70. Ms. Donahue told Mr. Chartier that she had not made any complaint against him to Mr. Kaubris.

71. This new information from Ms. Donahue was upsetting to Mr. Chartier. It confirmed his suspicion that Mr. Kaubris was fabricating information about him to lay the groundwork for future disciplinary actions. Mr. Chartier began to cry on the workroom floor.

72. Mr. Chartier realized that he needed to leave work due to his emotional state. With his wife's help, he asked Mr. Burgess to fill in for him for the rest of the day and left his work area once Mr. Burgess arrived.

73. Mr. Chartier went into Ms. Guimont's office to let her know Mr. Burgess was taking over for the day. Shortly after entering Ms. Guimont's

13

office, Mr. Chartier had a medical emergency and was removed from the office by emergency medical personnel.

74. Ms. Guimont knew that Mr. Chartier was having a serious medical episode in her office and that Mr. Chartier's spouse gave her prompt notice of his medical emergency.

75. Later that same day, Postal Service Nurse Kathy Dyer asked Mr. Chartier for a doctor's note clearing him to return to work.

76. The hospital where Mr. Chartier had been treated then faxed a note to Ms. Dyer clearing him to return to work with no restrictions.

77. But, that same day, Postal Service Transit Operations Supervisor Keith Hall left Mr. Chartier a voice message that he had been suspended from work.

78. The Postal Service did not consider whether Mr. Chartier's medical emergency entitled him to protections under the Family Medical Leave Act.

79. The Postal Service Threat Assessment Team (TAT) issued an incident summary about Mr. Chartier and Ms. Donahue's November 7 interaction.

80. The TAT incident summary falsely stated that Mr. Chartier pointed a finger in Ms. Donahue's face during their interaction. Ms. Donahue has since testified that that never happened.

81. One member of the TAT team had a single, three-minute phone call with Ms. Donahue as part of their investigation. The TAT team did not conduct any follow-up calls or in-person meetings with this central witness.

82. Nor did the TAT team even speak to Mr. Chartier about what happened.

83. Instead, the TAT incident summary relied on Mr. Chartier's protected medical conditions to justify barring him from the workplace, rather than any objective evidence of an actual threat. For example, the report relies in part of Mr. Chartier's history of panic attacks as a reason to bar him from the Postal premises.

84. At the time of the TAT report, Mr. Chartier was able to perform the essential functions of his job and had done so successfully for sixteen years.

85. On November 12, 2016, Mr. Chartier received a letter from the Postal Service Contracting Office dated November 7, 2016, that he had been temporarily denied "Access to Mail and Postal Premises."

86. Mr. Chartier later received January 6 and January 13, 2017 letters permanently denying him access to the mail and postal premises.

87. On December 18, 2017, Mr. Chartier received notice that the Postal Service was not renewing his mail delivery contract.

## Legal Claims

88. The allegations in paragraphs 1-87 are realleged.

89. Defendant intentionally discriminated against Mr. Chartier because of his disabilities, interfered with his right to medical leave, and retaliated against him for engaging in protected Equal Employment Opportunity activity in violation of Sections 501 and 504 of the Rehabilitation Act, 29 U.S.C. § 794; the Family Medical Leave Act, 29 U.S.C. § 2615; and Section 704 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a).

90. As a direct and proximate result of Defendant's intentional discrimination and retaliation, Plaintiff has suffered and will continue to suffer damages, including, but not limited to, back pay and benefits, medical expenses, worsening of mental health conditions, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to reputation, and other pecuniary and non-pecuniary losses.

**Wherefore,** Plaintiff requests relief against Defendant as follows:

(a) Enter declaratory relief that Defendant violated Plaintiff's statutory civil rights to be free of disability discrimination, Family Medical Leave Act interference, and unlawful retaliation;

(b) Enter injunctive relief ordering Defendant to:

- provide effective civil rights training for all human resources employees and all supervisors in Maine on the requirements of

all applicable laws prohibiting employment discrimination because of disability, interference with the right to medical leave, and retaliation for engaging in protected conduct and complete this training within 60 days of the entry of Judgment for Injunctive Relief;

- provide this training for two years after the date judgment is entered to all new human resources and supervisory employees within 60 days of their starting the position;
- maintain attendance sheets identifying each person who attended each training session and forward a copy of the attendance sheets to Plaintiff's counsel within seven days of each training session;
- post at each of its worksites in Maine a copy of a remedial notice detailing the judgment in this case as well as the order providing injunctive relief;
- send a letter printed on Defendant's letterhead to all of Defendant's employees in Maine advising them of the judgment in this case, enclosing a copy of their policies regarding anti-discrimination, medical leave, and retaliation, and stating that they will not tolerate any such discrimination, interference, or retaliation, and will take appropriate disciplinary action against

any employee or agent of Defendant who engages in such discrimination;

- send a letter printed on Defendant's letterhead to Mr. Chartier rescinding his denial of access to the mail and postal premises and apologizing for wrongfully denying him access in November 2016 and January 2017;

(c) Award Plaintiff back pay for lost wages and benefits, prejudgment interest, and front pay for future lost wages and benefits;

(d) Award Plaintiff medical expenses caused by Defendant's discrimination, interference, and retaliation;

(e) Award Plaintiff compensatory damages in amounts to be determined at trial by the jury and prejudgment interest thereon, including for the worsening of Plaintiff's mental health conditions;

(f) Award Plaintiff full costs and reasonable attorney's fees; and

(g) Award such further relief as is deemed appropriate.

Respectfully submitted,

Date: September 4, 2020

/s/ David G. Webbert
David G. Webbert
Johnson, Webbert & Young, LLP
160 Capitol Street, P.O. Box 79
Augusta, Maine 04332-0079
Tel: (207) 623-5110

E-Mail: dwebbert@work.law


/s/ Valerie Z. Wicks
Valerie Z. Wicks
Johnson, Webbert & Young, LLP
160 Capitol Street, P.O. Box 79
Augusta, Maine 04332-0079
Tel: (207) 623-5110
E-Mail: vwicks@work.law


*Attorneys for Plaintiff*